J-S56032-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: RELINQUISHMENT OF J.R., A MINOR | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: P.C., FATHER | : : : : : : | |
| | : | No. 474 MDA 2016 |

Appeal from the Order Entered February 22, 2016 in
the Court of Common Pleas of Lackawanna County
Orphans' Court at No(s):  A-61, Year 2014

BEFORE:  BENDER, P.J.E., PANELLA, J., STEVENS, P.J.E.*

MEMORANDUM BY STEVENS, P.J.E.:          **FILED AUGUST 16, 2016**

Appellant, P.C. ("Father"), appeals from the order dated February 18, 2016, and entered February 22, 2016, in the Lackawanna County Court of Common Pleas, by the Honorable Margaret Bisignani Moyle, granting the petition of the Lackawanna County Office of Youth and Family Services ("OYFS") and involuntarily terminating his parental rights to his minor, dependent child, J.R. ("Child"), a male born in September of 2005, pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), (8), and (b).[1]  After review, we affirm.

---

[1] The trial court entered a separate order involuntarily terminating the parental rights of Child's mother, J.R. ("Mother"), the same day, which Mother appeals at a separate appeal, Superior Court Docket Number 473 MDA 2016.
*(Footnote Continued Next Page)*

*Former Justice specially assigned to the Superior Court.

The trial court summarized the relevant procedural and factual history, in part, as follows:

Mother and Father have one biological child, J.R., whose date of birth is [in] September [of] 2005. The child was first placed by the agency in November of 2012, due to an incident wherein he was burned with a hair straightener. Mother was arrested and eventually pled guilty to Endangering the Welfare of a Child as a result of this incident. Mother's case was transferred to Mental Health Treatment Court upon her release from Lackawanna County prison. The child remained in placement until October of 2013 when he was returned to Mother. He had been placed in kinship care with [M]aternal [G]randmother.

. . .

The minor child and his sister were returned to Mother in October of 2013 for a period of three (3) months. During that time, Mother was being supervised in Mental Health Treatment Court. Initially, she was in full compliance with Mental Health Court. However, on January 2, 2014, Mother was asked to produce a urine screen. Mother absconded from the Lackawanna County Courthouse and was on the run for four (4) weeks. The child and his sister were placed on January 2, 2014, in kinship foster care due to Mother's flight.[2] Mother was eventually apprehended and incarcerated on felony drug charges on February 5, 2014. She was arrested and incarcerated on that date for Possession with Intent to Deliver and for a parole violation.

Trial Court Opinion, 4/4/16, at 1-2 (citations to record omitted) (footnotes omitted).

_(Footnote Continued)_ ────────────────

[2] Child was initially placed with [M]aternal [G]randmother and then a friend of Mother, but was ultimately removed and placed in traditional foster care due to violation of the established safety plan. N.T., 1/13/16, at 40-41.

Upon her apprehension in February of 2014, Mother was incarcerated in Lackawanna County for approximately one year and then transferred to SCI Cambridge Springs until her release in August 2015. N.T., 1/13/16, at 20, 23, 33, 42; N.T., 1/28/16, at 106, 197-98. Father, who was incarcerated at the time of Child's birth through the time of his placement, was incarcerated in Lackawanna County and then transferred to federal facilities in West Virginia and Kentucky until his release in September 2014. N.T., 1/13/16, 44, 47, 65; N.T., 2/1/16, at 86-88.

As a result of the above, an emergency order for protective custody was granted on November 16, 2012. OYFS Exhibit C, 1/13/16.[3] The trial court thereafter adjudicated Child dependent on January 7, 2013. *Id.* After Child had been returned to Mother's custody in October 2013, a subsequent emergency protective custody order was entered on January 21, 2014. *Id.*

OYFS filed a petition to terminate parental rights on August 4, 2014. Subsequent to Father's being granted six months to reunify with Child,[4] OYFS proceeded with its petition and all contact between Child and both parents was suspended. *See* Order, filed 12/4/14; N.T., 1/13/16 at 24-26, 29, 36, 66-67; N.T., 1/28/16, at 80. The trial court held termination

[3] We note these orders are not provided elsewhere in the certified record.

[4] As noted by OYFS caseworker Sadie O'Day, Father was actually given an additional six months beyond the six months he was initially granted. N.T., 1/13/16, at 36.

hearings on January 13, 2016, January 28, 2016, and February 1, 2016.[5] At the termination hearings, OYFS presented the testimony of the following: OYFS caseworker, Sadie O'Day; OYFS case aide, Keiran Loughney; OYFS caseworker, Rebecca Brojack; Families United Network foster care case manager, Helenmae Newcomer; NHS Human Services therapist, Elizabeth Lewis; and foster mother, K.P. Mother testified on her own behalf. Father testified on his own behalf and presented the testimony of his father, Child's paternal grandfather, G.C.

By order dated February 18, 2016, and entered February 22, 2016, the trial court involuntarily terminated the parental rights of Father. On March 18, 2016, Father, through counsel, filed a notice of appeal, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

On appeal, Father raises the following issues for review:

[1.] Whether the [trial court] erred as a matter of law and/or manifestly abused its discretion in determining [OYFS] sustained its burden of proving the termination of F[ather]'s parental rights is warranted under Sections 2511(a)(1), 2511 (a)(2), 2511(a)(5) and/or 2511(a)(8) of the Adoption Act?

[2.] Even if this Court concludes [OYFS] established statutory grounds for the termination of F[ather]'s parental rights,

---

[5] While the hearing was originally scheduled for December 4, 2014, in addition to Father's six-month reunification period, numerous continuances further delayed this matter. N.T., 1/13/16, at 35-36, 63; Order, filed 12/23/15; Order, filed 11/9/15; Order, filed 10/15/15; Order, filed 8/12/15.

whether the [trial court] nevertheless erred as a matter of law and/or manifestly abused its discretion in determining [OYFS] sustained its additional burden of proving the termination of F[ather]'s parental rights is in the best interests of the [child]?

Father's Brief, at 5.

In matters involving involuntary termination of parental rights, our standard of review is as follows:

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re Adoption of S.P.*, 616 Pa. 309, 47 A.3d 817, 826 (Pa. 2012). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* The trial court's decision, however, should not be reversed merely because the record would support a different result. *Id.* at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. *See In re R.J.T.*, 9 A.3d [1179, 1190 (Pa. 2010)].

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.,* 835 A.2d 387, 394 (Pa. Super. 2003) (citation omitted). The termination of parental rights is guided by Section 2511 of the Adoption Act,

23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa. Super. 2000) (*en banc*) (quoting *Matter of Adoption of Charles E.D.M. II*, 708 A.2d 88, 91 (Pa. 1998)).

In the instant case, the trial court terminated Father's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), and (8), as well as (b).[6]

---

[6] While the trial court's order does not specify the subsections under which it terminated Father's parental rights, in its opinion the trial court notes that "[OYFS] has satisfied its burden of proof by establishing, by clear and convincing evidence, Father's parental rights should be terminated pursuant to **each subsection of [23 Pa.C.S.A. § 2511(a)] alleged**." Trial Court
*(Footnote Continued Next Page)*

We have long held that, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of section 2511(a), as well as section 2511(b). *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Here, we analyze the court's termination pursuant to sections 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> \*\*\*
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> \*\*\*
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing,

(Footnote Continued) ───────────────

Opinion, 4/4/16, at 18 (emphasis added). OYFS sought termination pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), and (8). Petition for Involuntary Termination, 8/4/14. Father argues, as he argued at hearing, that subsections (a)(5) and (a)(8) are not appropriate due to his incarceration at the time of Child's placement. Father's Brief, at 16-17. In its brief, OYFS indicates that it does not contest this argument. OYFS's Brief, at 13. We note the trial court only conducts an analysis of subsection (a)(2), stating, "[P]roof by clear and convincing evidence pursuant to one of the subsections alleged satisfies the first prong of 23 Pa.C.S.A. § 2511(a). Therefore, this Court will not address the other subsections. Trial Court Opinion, 4/4/16, at 19 n.9.

furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

We first examine the court's termination of Father's parental rights under section 2511(a)(2).

In order to terminate parental rights pursuant to 23 Pa.C.S.A § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa. Super. 2015) (quoting *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002)).

In *In re Adoption of S.P.*, 47 A.3d 817 (Pa. 2012), our Supreme Court, in addressing Section 2511(a)(2), held that "incarceration is a factor, and indeed can be a determinative factor, in a court's conclusion that grounds for termination exist under § 2511(a)(2) where the repeated and

continued incapacity of a parent due to incarceration has caused the child to be without essential parental care, control or subsistence and that the causes of the incapacity cannot or will not be remedied." *Id.* at 828. ***See also In re D.C.D.***, 105 A.3d 662, 675 (Pa. 2014) (holding that the father's incarceration prior to the child's birth and until the child is at least age seven renders family reunification an unrealistic goal. As such, the court was within its discretion to terminate parental rights "notwithstanding the agency's failure" to follow the court's initial directive that reunification efforts be made).

In the case *sub judice*, in finding grounds for termination pursuant to subsection 2511(a)(2), the trial court indicated that Father was unable to achieve his reunification goals. Trial Court Opinion, 4/4/16, at 18-19. The court further emphasized the limited and shallow contact between Father and Child. *Id.* at 19. Specifically, the court stated:

> Upon Father's release from prison, the agency set up a permanency plan with originally two (2) goals for Father. Father was to complete an interstate compact and a parenting class. The December 2014 TPR was continued to allow Father six months to complete the goals set forth by the agency. Father's application for an interstate compact was denied on April 19, 2015, due to lack of appropriate housing and employment. Caseworker Sadie [O'Day] testified she told Father she would resubmit the interstate compact if Father provided the agency with a lease in his name, along with two (2) pay stubs. Father only submitted one pay stub and he did not submit a lease. In addition, at the time of the termination hearing, Father had not submitted to a drug and alcohol [evaluation]. Even though Father was given six (6) months to achieve reunification with his son, he had more than twelve (12) months to achieve the goals

due to court delays. He was unable to accomplish the goals and achieve reunification in the twelve (12) month period.

Further, Father has only had six (6) supervised visits with his son in at least the last twelve (12) months despite having the ability to request additional visits. In all contact that he had with [Child] it was repeatedly testified to that he did not make the most of the interactions. Father would often partake in superficial conversations with [Child], and he would text or talk on his cell phone. Additionally, Father was not consistent in answering the weekly phone calls. He would also not answer his phone for weeks at a time. Father also would not make the most of his physical time with [Child]. He inexplicably left one of the supervised visits for an hour and fifteen minutes without saying a word. He arrived and hour and thirty minutes late for another. Based on this analysis and the above-mentioned facts, it is clear to this Court that the agency has satisfied its burden of proof with respect to 2511(a)(2).

*Id.* at 18-19 (footnote omitted).

Father, however, argues that the "completion of his prison sentence remedied the circumstances which rendered him incapable of consideration as a placement resource at the time of placement of the Child." Father's Brief, at 11. Father recounts that, while incarcerated, he participated in proceedings related to Child via telephone and maintained contact with Child. *Id.* Father additionally notes his compliance with that which OYFS required of him. *Id.* at 11-13. Father reports that he completed a parenting program. *Id.* at 13. Father also indicates that he completed a drug and alcohol program while incarcerated and was required to further do so only if "recommended." *Id.* Father provides regular urine screens to his probation officer and is compliant with the terms of his probation. *Id.* Further, although denied, Father cooperated with and

- 10 -

completed the interstate compact process. *Id.* at 12. Father avers that OYFS failed to resubmit his application once he was employed and had moved to the third floor. *Id.*

Moreover, Father claims he maintained contact with both Child and OYFS. *Id.* at 13-14. Father contends his interactions with Child were positive and "[a]ny level of apathy expressed . . . occurred because Father and Child were limited in their interactions to line-of-sight supervision on the confines of Father's sofa." *Id.* at 14 (citations to record omitted).

A review of the record supports the trial court's finding of grounds for termination under section 2511(a)(2). Father was incarcerated from the time of Child's birth until September 2014. N.T., 1/13/16, at 44, 47, 65; N.T., 2/1/16, at 86-88. OYFS caseworker Sadie O'Day then testified to Father's failure to complete that which the Agency required of him following his release. *Id.* at 44-46, 54-55, 67-69. Initially, Father questioned his paternity of Child, which delayed the interstate compact. *Id.* at 44-45. Then, after his application was denied due to insufficient housing and employment, Ms. O'Day stated that Father failed to provide a lease and two paystubs, as requested by the interstate office in order to show the reasons for denial had been remedied. *Id.* at 45, 54-55, 83-85. She testified, in part, as follows:

> Well, he was denied through interstate compact. The reasons for that denial as I stated prior were him not having appropriate housing and employment. So in order for our Agency to resubmit that packet to interstate, the interstate office was requesting two pay stubs and a copy of the lease from him

in order for them to have proof that he alleviated those circumstances.

So he sent me one pay stub. And I hadn't received anything after that. He didn't provide me with a lease for an apartment. He did state to me that he had moved upstairs from where his father was living. But the following visit that he had with [Child] in New Jersey [sic] was still in the same apartment that he had been in.

So without the proper document that he had obtained his own apartment and he had sufficient funds to care for [Child], we couldn't resubmit the application. Up until this date I haven't received anything.

*Id.* at 54-55. Further, Father did not complete a drug and alcohol program after his release.[7] *Id.* at 45. Ms. O'Day therefore assessed Father's compliance as "minimal" and progress as "none." *Id.* at 55.

In addition, Father participated in only six visits with Child, despite the ability to request additional visits in Scranton.[8] *Id.* at 46-47. OYFS case aide Keiran Loughney further testified to Father's inexplicably leaving for a period of one hour and fifteen minutes during a visit in February 2015, after he was unable to reach Father by telephone in advance of the visit and a delay in Father's responding and answering the door upon arrival. N.T., 1/28/16, at 12-17. While Father indicated that he had pre-approval from

---

[7] While this requirement was not made a part of the permanency plan, Ms. O'Day related that it was required during a prior court hearing. N.T., 1/13/16, at 72.

[8] As reported by Ms. O'Day, Father would have only had to contact her office and notify and obtain approval from his probation officer. N.T., 1/13/16, at 46-47, 80-82, 87.

Ms. O'Day to leave for a medical appointment during the February 2015 visit, Ms. O'Day disputed this contention. N.T., 2/1/16, at 105-07, 162-63. Furthermore, Mr. Loughney offered that Paternal Grandfather's girlfriend, who was present in the residence at the time, suggested Father went to the store. N.T., 1/28/16, at 15. Similarly, OYFS caseworker Rebecca Brojack noted Father arrived one hour and thirty minutes late for another visit in October 2015.[9] *Id.* at 59-60. Foster Mother also noted scheduled telephone calls that went unanswered. N.T., 2/1/16, at 29. Father likewise, by his own admission, refused to co-sign authorization for medication for Child. N.T., 2/1/16, at 135.[10] Hence, the record substantiates the conclusion that Father's repeated and continued incapacity, abuse, neglect, or refusal has caused Child to be without essential parental control or subsistence necessary for his physical and mental well-being. *See In re Adoption of M.E.P.*, 825 A.2d at 1272. Moreover, Father cannot or will not remedy this situation. *See id.*

---

[9] Ms. Brojack noted that, although the visit should have been cancelled after fifteen minutes without appearance and without a telephone call, she remained with [C]hild as he did not have a ride until later. N.T., 1/28/16, at 60. Further, a review of the record reveals that Father was late for the termination hearings on January 13, 2016, January 28, 2016, and February 1, 2016. N.T., 1/13/16, at 10, 29; N.T., 1/28/16, at 4-5, 12; N.T., 2/1/16, at 4, 14.

[10] Child's home therapist, Elizabeth Lewis, testified to Child's diagnoses of ADHD, PTSD, mood dysregulation disorder, and bipolar traits and taking Adderall and Clonidine. N.T., 1/28/16, at 127-29, 133.

We next determine whether termination was proper under section 2511(b). With regard to section 2511(b), our Supreme Court has stated as follows:

[I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, 620 A.2d [481, 485 (Pa. 1993)] this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791. However, as discussed below, evaluation of a child's bonds is not always an easy task.

*In re T.S.M.*, 71 A.3d at 267. "[I]n cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010) (citations omitted).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010) (internal citations omitted).

In the instant matter, in discussing Section 2511(b), the trial court highlighted the limited interaction between Father and Child, with Child at no

time being in Father's care, and lack of evidence of a bond. Trial Court Opinion, 4/4/16, at 20. Similarly, the court referenced the extent of Child's time in placement and need for permanency. *Id.* The court expressed:

> As already stated above, the testimony established [Child] and his sister, C.R., have resided together in their current foster home since March 24, 2014. This placement has afforded the child the permanency he has wanted and needed. In the foster home all of emotional, physical, and developmental needs are being met. He has had home based therapy with Ms. Lewis throughout his placement. Since his first placement in November 2012, the child has never been in his father's care and has only had six (6) contact visits with him. As of this date, the child has been in placement for a total of thirty-six (36) months, over two (2) separate placements. As stated above, the delays and lack of permanency are clearly harmful to the child's emotional well-being. Termination of his parent's rights will allow him to achieve permanency and end the uncertainty that has consumed the past three (3) years of his life. Furthermore, there is no evidence that a bond exists between Father and [Child]. Therefore, it is in the best interest of the child for the parental rights of Father be terminated [sic].

*Id.* at 19-20.

Father asserts, however, that the court "ignores the testimony of [OYFS's] own witnesses on the issue of bonding." Father's Brief, at 19. Father points to the testimony of Helenmae Newcomer regarding a picture of Child and him displaying alleged bonding behavior, and the testimony of Foster Mother that Child refers to Father as "Dad," "Daddy," and "Father." *Id.* Father also maintains testimony of both Mother and Paternal Grandfather, as well as photographic evidence, supports the existence of a bond between Father and Child. *Id.* Father concludes, "The record is devoid

of the quantum of evidence necessary to document the effect terminating [Father's] parental rights will have on [Child]. Furthermore, the [trial court] failed to fully consider the effect terminating [Father's] parental rights will have on the emotional needs and welfare of [Child] pursuant to Section 2511(b)." *Id.* at 20.

Here, the record corroborates the trial court's termination order pursuant to section 2511(b). Initially, we note that, while Father had visitation, the visits were supervised.[11] N.T., 1/13/16, at 49; N.T., 1/28/16, at 7, 9, 46. However, in September 2015 the court discontinued contact between Father and Child, providing for one more visit and telephone call. N.T., 1/13/16, at 24-26, 29; N.T., 1/28/16, at 80. Agency workers who supervised the visitation between Father and Child testified to limited and/or superficial interaction between Father and Child and/or Father's lack of focus. N.T., 1/13/16, at 47; N.T., 1/28/16, at 19-20, 40, 52-53, 57, 85-86. As described by caseworker O'Day, "The interaction between [Child] and his father was minimal. Most of the time it was either watching TV or he had a few phone calls from family members that he left [Child] to talk to them on the phone." N.T., 1/13/16, at 47. OYFS caseworker Rebecca Brojack reported having to redirect Father from his cell phone to Child during a visit.

_____

[11] As attested to by Ms. Brojack, Father protested his visits being supervised, and did so in the presence of Child. N.T., 1/28/16, at 49-50, 58, 81-83, 88-89.

N.T., 1/28/16, at 52-53. Likewise, caseworker Sadie O'Day and Foster Mother confirmed Father's lack of attention and/or substance during Father's telephone contact with Child. N.T., 1/13/16 at 48-49; N.T., 2/1/16, at 28-31. Moreover, Ms. O'Day and Foster Mother specifically testified to the negative impact Father's lack of focus during these interactions had on Child, particularly with Foster Mother noting a change in Child's demeanor. N.T., 1/13/16, at 48-49; N.T., 2/1/16, at 27-29. Ms. Brojack also detailed Child's reluctance prior to a visit in August 2015, and that he was upset on the way home.[12] N.T., 1/28/16, at 47-49, 58, 72-73, 81, 83. Of note, Ms. Brojack additionally recounted Child's discomfort and attempt to pull away or "scooch over" when Father kept pulling him closer and into his chest during this visit. N.T., 1/28/16, at 57, 85-86.

Given her observation and knowledge of the interactions between Father and Child, Ms. O'Day emphasized the lack of existence of a bond between Father and Child. N.T., 1/13/16, at 48-49, 87. Ms. O'Day testified on direct examination as follows:

> Q. Were you able to witness any type of bond between father and child?
>
> A. There was the visit I was at was only their second visit. There was no bonding experience that I noticed. There wasn't

---

[12] Aside from Father's objections to his visits being supervised, Ms. Brojack testified that Father additionally raised issues related to child support in the presence of Child during this August 2015 visit. N.T., 1/28/16, at 49-50, 54-55, 58, 68-69, 81-83, 88-89. As such, it was Ms. Brojack's impression that Child was "sad because of how the visit [] happened." *Id.* at 81.

conversations regarding him getting to know anything about what [Child] was interested in or what he was doing. I've also been present during the phone conversations which seem to be the same way in regards to his father just - -

Q. Can you elaborate?

A. Mostly the conversations would be how are you? What are you doing? What did you eat today? There wasn't a lot of in-depth conversations about getting to know [Child], what his interests were, what he liked to do, how he was doing in school. There was often times where [Child] would get excited about things that he wanted to tell [his] father during the phone conversations when he would say it and wouldn't really get a supportive reaction from his father. He would seem like he was let down that he had waited until this phone call so he can – whether it be Halloween of his birthday, something exciting happened that he wanted to share soccer games where he kicked a goal and it was always him – the conversations were kind of received with okay. So you would see in his face that he was a little bit disappointed that there wasn't more of a nurturing conversation or more of a supportive excited conversation about the things that he was excited about.

*Id.* at 48-49. When asked on cross-examination by counsel for Father to indicate her concerns regarding the relationship between Father and Child, Ms. O'Day further stated:

The bond that they – the lack of a bond between him and his son and the phone conversations that he has had with [Child], not being as involved in [Child's] life as expressed to us that he wanted to be. He had never come to -- one time when we did give him additional time after the last hearing of one additional visit and one additional phone call, he did come here for a visit. He was an hour and a half late for the visit and was only able to visit with [Child] for about 20 minutes.

But aside from that since last December, he has not requested a visit here. He has not come here for additional visits with [Child] even though that was something we said during that court hearing that would be allowed if he requested it in enough time.

- 18 -

*Id.* at 87. In turn, Child's therapist, Elizabeth Lewis, who indicated that she discussed the termination petition with Child, stated that Child then inquired as to continued visitation and/or contact with Maternal Grandmother, not Mother or Father. N.T., 1/28/16, at 114.

Moreover, and significantly, foster care case manager Helenmae Newcomer confirmed a bond between Child and foster parents from her observation of their interactions and relationship. *Id.* at 97. Likewise, Ms. O'Day testified Child was doing "well" in the foster care placement where he has been for two years.[13] N.T., 1/13/16, at 18.

Thus, as confirmed by the record, the emotional needs and welfare of Child favor termination. Accordingly, based upon our review of the record, we find no abuse of discretion and conclude that the trial court appropriately terminated Father's parental rights under 23 Pa.C.S.A. §§ 2511(a)(2) and (b).

Based on the foregoing analysis of the trial court's termination of Father's parental rights, we affirm the order of the trial court.

_____

[13] Notably, Child's sister, C.R., is currently placed with him. N.T., 1/13/16, at 100-01; N.T., 2/1/16, at 10-11.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/16/2016